UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *ex rel.*
CRAIG W. LOVE,

                     Plaintiff,

  – against –

TEACH FOR AMERICA, INC.,

                    Defendant.

17 Civ. _____

**COMPLAINT**

Jury Trial Demanded

Plaintiff the United States and Relator Craig W. Love, by and through their undersigned counsel, hereby allege for their Complaint against defendant Teach For America, Inc., as follows:

## NATURE OF THE ACTION

1.    Relator Craig Love brings this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, on behalf of himself and the United States of America, to recover treble damages and civil penalties arising from false statements and false claims knowingly submitted or knowingly caused to be submitted to the federal government by defendant Teach For America, Inc.

2.    Between approximately 2010 and 2015, Teach For America knowingly submitted false statements and false claims to the United States in connection with grants it received from the Investing in Innovation Fund, the Supporting Effective Educator Development Fund, the AmeriCorps Program, as well as other federal grant programs.

3.    Specifically, Teach For America fraudulently failed to apply credits it received to offset grant expenses, failed to properly allocate expenses among federal grants and other programs, and failed to properly allocate employees' salaries.

4.      As a result of its fraud, Teach For America improperly obtained millions of dollars in federal grants it was otherwise not entitled to receive.

### PARTIES

5.      Relator, Craig W. Love ("Love"), is a resident of New York State and was the Acting Treasurer and Controller for Teach for America from July 2013 through January 2014.

6.      Plaintiff United States of America, through its various agencies, including the U.S. Department of Education and others, awards and administers federal grants.

7.      Defendant Teach For America, Inc. is a not-for profit corporation incorporated under the laws of the State of Connecticut and registered to do business in New York, with its principal place of business at 25 Broadway, New York, New York 10004.

8.      Non-party Leadership for Educational Equity ("LEE") is a not-for profit corporation incorporated under the laws of the District of Columbia and registered to do business in New York, with its principal place of business at 1805 7th Street, N.W., 8th Floor, Washington, D.C. 2001.

9.      Non-party Teach For All, Inc. ("TFALL") is a not-for profit corporation incorporated under the laws of the State of New York and registered to do business in New York, with its principal place of business at 25 Broadway, New York, New York  10004.

### JURISDICTION AND VENUE

10.      This court has jurisdiction over this action under 31 U.S.C. § 3732(a) & (b), and 28 U.S.C. § 1331.

11.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) in that the defendant can be found, resides and/or transacts business in this District and in that a substantial number of the false claims at issue were

{00069265 1 }                                                2

submitted or caused to be submitted in this District.

12. Mr. Love has direct and independent knowledge of the information upon which the allegations are based and has voluntarily provided notice of this action to the U.S. Attorney's Office for the Southern District of New York before filing this *qui tam* action.

## STATUTORY FRAMEWORK

### A.   The False Claims Act

13. The False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), available at 1986 U.S.C.C.A.N. 5266.  As relevant here, the FCA establishes civil penalties and treble damages liability to the United States for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B) & (G).

14. "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference to the truth or falsity of the information, and does not require proof of specific intent to defraud.  *Id.* § 3 729(b)(1).

**B.    OMB Circular A-122**

15.    OMB Circular No. A-122 (the "Circular"), codified at 2 C.F.R. Part 230 (Cost Principles for Non-Profit Organizations (OMB Circular A-122)), establishes "principles for determining costs of grants, contracts, and other agreements with non-profit organizations." Circular, Purpose, 2 C.F.R. § 230.5 (2013); *see also* 2 C.F.R. § 200.100(a)(1) (2014).[1]  The Circular applies to non-profit organizations and is "designed to provide that the Federal Government bear its fair share of costs."  Circular, Policy; 2 C.F.R. § 230.15 (2013); *see also* 2 C.F.R. § 200.100(c) (2014).  With limited exceptions not applicable here, the Circular requires recipients of federally sponsored agreements, *e.g.,* grants, to charge grants only for work actually performed as a part of that sponsored agreement.

16.    The Circular provides that to be allowable under an award, costs must meet the following general criteria:

a.    Be reasonable for the performance of the award and be allocable thereto under these principles.

b.    Conform to any limitations or exclusions set forth in these principles or in the award as to types of amount of cost items.

c.    Be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the organization.

d.    Be accorded consistent treatment.

e.    Be determined in accordance with generally accepted accounting principles (GAAP).

f.    Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period.

g.    Be adequately documented.

---

[1] In 2014, OMB Circular A-122 was superseded by 2 C.F.R. Part 200.  2 C.F.R. § 200.104 (2014).  Because the allegations in the Complaint began in 2010 and continued until at least 2015, we cite both provisions where relevant.

Case 1:17-cv-02062-KBF   Document 11   Filed 02/21/18   Page 5 of 17

Circular, Attachment §A.2; 2 C.F.R. Part 230, Appendix A § A.2; *see also* 2 C.F.R. § 200.403 (2014).

## FACTUAL ALLEGATIONS

### A.     The Federal Grants

17.    The Investing in Innovation Fund, established under section 14007 of the American Recovery and Reinvestment Act of 2009 (ARRA), provides funding to support (1) local educational agencies (LEAs) and (2) nonprofit organizations in partnership with (a) one or more LEAs or (b) a consortium of schools ("i3 Grants").  The purpose of this program is to provide competitive grants to applicants with a record of improving student achievement and attainment in order to expand the implementation of, and investment in, innovative practices that are demonstrated to have an impact on improving student achievement or student growth, closing achievement gaps, decreasing dropout rates, increasing high school graduation rates, or increasing college enrollment and completion rates.  Between 2010 and 2015, Teach For America received approximately $10 million annually in i3 Grants.

18.    In addition to receiving the i3 Grants, between 2012 and 2015, Teach For America also received approximately $15 million in grant money from the federal Supporting Effective Educator Development "SEED" Grant Program.  The SEED Grant Program provides funding for grants to national non-profit organizations for projects that support teacher or principal training or professional enhancement activities.

19.    The Race to the Top program, established under sections 14005 and 14006 of ARRA, provides funding to States to spur and reward innovation and reforms in state and local district K-12 education.  Between 2010 and 2015, Teach For America received more than $25 million in Race to the Top grant money from various States.

{00069265 1 }                                    5

20.   In addition, between 2010 and 2015, Teach For America received approximately $50 million in grants from AmeriCorps.  AmeriCorps is a program of the Corporation for National and Community Service, an independent federal agency.  AmeriCorps provides grants to a network of local and national organizations and agencies committed to using national service to address critical community needs in education among other areas.  Pursuant to the terms of the grants, Teach For America was required to use the AmeriCorps funding to recruit, place and supervise AmeriCorps members nationwide.

21.   In total, between 2010 and 2015, Teach For America received approximately $140 million in Federal Grants.

22.   In addition to the Federal Grants, Teach For America also received grants and donations from non-federal sources, *e.g.*, states and private donors.

23.   As set forth below, Teach For America fraudulently obtained Federal Grant funds by knowingly failing to apply credits it received to offset grant expenses, failing to properly allocate expenses among federal grants and other programs, and failing to properly allocate employees' salaries.

**B.     Teach For America Fraudulently Obtained Funds from Federal Grants by Intentionally Not Applying Credits to Offset Grant Expenses**

24.   As set forth above, OMB Circular A-122 establishes the principles governing the Federal Grants and is "designed to provide that the Federal Government bear its fair share of costs."  Circular, Policy; 2 C.F.R. § 230.15; *see also* 2 C.F.R. § 200.100(c) (2014).  To that end, in addition to the requirements set forth in paragraphs 15 and 16 above, the Circular requires that credits, or income, received by a grantee as a result of expenditures funded by the Federal Grants be applied to offset those costs.  Circular, Attachment §A.5; 2 C.F.R. Part 230, Appendix A §

{00069265 1 }                                          6

A.5; 2 C.F.R. § 200.406(a) (2014).

25.    Specifically, Section A.5 of the Attachment to the Circular sets forth principles for applying credits received by a grantee.  The Circular defines applicable credits as "those receipts, or reduction of expenditures which operate to offset or reduce expense items that are allocable to awards as direct or indirect costs" and provides that "[t]o the extent that such credits accruing or received by the organization relate to an allowable cost, they shall be credited to the Federal Government either as a cost reduction or cash refund, as appropriate."  Circular, Attachment §A.5; 2 C.F.R. Part 230, Appendix A § A.5; *see also* 2 C.F.R. § 200.406(a) (2014).

26.    Notwithstanding this requirement, Teach For America repeatedly failed to apply credits received to offset Federal Grant expenses.

27.    For example, Teach For America received "fee for service" revenue.  Fee for service revenue consists of payments received from school districts across the United States pursuant to contractual agreements to recruit, select, train, and place corps members to teach within those school districts.  Teach For America received fee for service revenues averaging approximately $20 to $25 million per year between 2010 and 2015.  These revenues were not offset against the gross costs charged to the Federal Grants for the same expenses, namely, costs incurred for recruiting, selecting, training, and placing those corps members.

28.    In or about November or December 2013, Relator had a conversation with E. Miguel Rossy, Teach For America's Chief Financial Officer, and advised him that Teach For America was required to credit the fee for service revenue to the Federal Grants as an offset. Notwithstanding this conversation, Teach For America did not offset the fee for service revenue against the gross costs charged to the Federal Grants for the same expenses.

29.    Teach For America also failed to apply credits to the rents it charged to its Federal

Grants, amounts totaling approximately $1 million per year, that Teach For America collected from the sub-let of its office space.  Specifically:

(a)    Teach For America maintained an office in St. Louis, Missouri, which it charged to its i3 grant.  The office, however, was not occupied by Teach For America but, rather, was sublet to another tenant.  Notwithstanding the fact that the space was sublet, Teach For America continued to charge the rent to its i3 grant, and failed to credit the rent it received to its Federal Grants.

(b)    Teach For America shared space at 315 W. 36th Street, New York, New York 10018, with LEE, a lobbying entity for Teach For America, and TFALL, a related but separate entity.  LEE and TFALL reimbursed Teach For America through a Revenue Sharing Agreement.  Notwithstanding this agreement, Teach For America allocated 100% of the rent for this space to Teach For America, and failed to credit the income it received from the Revenue Sharing Agreement to its Federal Grants.

30.    On October 3, 2013, Relator advised Nancy Kong, Teach For America's Vice President of Finance, that rent was being improperly charged to the i3 grant.  Within one week of that discussion, Teach For America submitted to the Department of Education its trial balance with respect to the i3 Federal Grant, leaving the rent charge unchanged to avoid reimbursing the funds and raising any "red flags."

31.    In addition, Teach For America failed to credit to its Federal Grants, payments and reimbursements it received from teachers attending its programs, vendors, employees, business partners and others.  For example, Teach For America received payments from students for teacher certifications that Teach For America provided, but never credited these payments to the Federal Grants which had funded the gross costs related to providing these same activities.

32.    Teach For America also failed to credit to the Federal Grants income received from the sale of property rights, such as intellectual property rights and databases, developed with Federal Grant funds.  These fees totaled in excess of $1 million each year.

**C.     Teach For America Falsely Inflated the Amount Received from Federal Grants by Failing to Properly Allocate Its Expenses**

33.     In addition to failing to credit income received to the Federal Grants, Teach For America falsely inflated the amounts it received by failing to properly allocate its expenses among its Federal Grants, state grants, and restricted private donations.[2]

34.     Section A.4 of the Attachment to the Circular sets forth principles for allocating costs incurred by a grantee.  The Circular provides that a cost is allocable to a Federal Grant if it, among other things "[b]enefits both the award and other work and can be distributed in reasonable proportion to the benefits received."  Circular, Attachment §A.4(a); 2 C.F.R. Part 230, Appendix A § A.4(a); *see also* 2 C.F.R. § 200.405(a) (2014).

35.     Section A.4(b) provides further that "[a]ny cost allocable to a particular award or other cost objective under these principles may not be shifted to other Federal awards to overcome funding deficiencies, or to avoid restrictions imposed by law or by the terms of the award."  Attachment § A.4(b); 2 C.F.R. Part 230, Appendix A § A.4(b); *see also* 2 C.F.R. § 200.405(c) (2014).

36.     Teach For America never allocated costs in reasonable proportion to the benefits received.  Instead Teach For America merely allocated costs to the Federal Grants based upon whether it had appropriate supporting documentation so as to maximize federal reimbursement.

---

[2] In addition, Teach For America had no bidding or cost control procedures for expenses. Therefore, regardless of how the costs were allocated, a substantial portion of the costs incurred by Teach For America were excessive.  For example, all furniture was purchased from a store on Sixth Avenue in New York City and shipped at Teach For America's expense, regardless of the destination, even if that destination was in California.  In addition, Teach For America had numerous employees in routine administrative positions, such as finance, budgeting, grants management, IT, and human resources, who commuted great distances daily or weekly, and were reimbursed by Teach For America for 100% for their expenses – such as airfare or other travel, hotel, and meals.

a.   <u>Restricted Donations</u>

37.   Between 2010 and 2015, Teach For America received hundreds of millions of dollars in donations that were restricted for purposes such as teacher recruitment and selection, placement, and professional development.

38.   For example, in 2013, Teach For America received a donation that was to be used solely for the purpose of funding the training and hiring of five specialized teachers in the San Francisco school system.  Notwithstanding these restrictions, Teach For America took these donor funds into unrestricted income while at the same time allocating all the associated expenses incurred to the Federal Grants.

39.   These expenses included expenses incurred by Teach For America in connection with its Summer Institute.  The Summer Institute is an 8-week residential summer training program run by Teach For America to train the people it recruits to serve as teachers.  In connection with the Summer Institute, Teach For America incurs costs for the room, board, travel, and time spent by the trainers, as well as board costs for the student-teachers.

40.   In other words, Teach For America allocated its expenses to the Federal Grants even though it also transferred restricted income into unrestricted income, claiming it had spent the donor's funds to do so, based upon the same expenses (<u>i.e.</u>, double counting).

41.   In his conversation with Rossy in late 2013 referenced in Paragraph 28 above, Relator also advised Rossy that if an expense or type of expense was already specifically funded, either directly or indirectly, by another income source, that expense could not also be charged at full value to a federal grant.  In response, Rossy told Relator that "it's our money," and ignored Relator's advice.

42.   Teach For America's double counting of the same expenses enabled it to amass a

{00069265 1 }                                          10

huge surplus of unrestricted funds (in excess of $250 million as of December 31, 2013) despite only receiving an average of $20 million in contributions annually for unrestricted purposes, the majority of which was spent on unrestricted, ineligible expenses (e.g., development and fundraising, alumni affairs, and related partners TFALL and LEE).  Thus, Teach For America not only overcharged the Federal Grants, it misled its donors and misused funds donated for a restricted purpose.

b.   Rent Expenses

43.   Attachment A to the Circular provides that depreciation or use allowances (e.g., rent) "on buildings used for more than one function, and on capital improvements and equipment used in such buildings, shall be allocated to the individual functions performed in each building on the basis of usable square feet of space, excluding common areas, such as hallways, stairwells, and restrooms."  Attachment A § D.3(c)(1)(b); 2 C.F.R. Part 230, Appendix A § D.3(c)(1)(b); *see also* Appendix IV to Part 200, § B.3(c)(1)(b) (2014).

44.   Section B.43 of the Attachment to the Circular sets forth principles for allocating the rental costs of buildings and equipment, and provides that the Financial Accounting Standards Board Statement 13 ("FASB"), Accounting for Leases, applies.  Attachment § B.43.d; 2 C.F.R. Part 230, Appendix B § B.43(d); *cf.* 2 C.F.R. § 200.465(c) (2014) (providing for the application of GAAP).

45.   The FASB provides that the expenses associated with occupying and maintaining a building may be allocated among the NFP's functions based on the square footage of space occupied by each program and supporting service.  Only if floor plans are not available and the measurement of the occupied space is impractical, may an estimate of the relative portion of the building occupied by each function be used.

{00069265 1 }                                              11

46.    Notwithstanding these provisions, Teach For America allocated rent expense, and related charges (e.g., taxes, utilities, common costs, etc.), based on employee "headcount" information obtained from Workday, Teach For America's database of employee email addresses (the "Headcount Report").

47.    Teach For America used this method for allocation of rent expenses even though it maintained precise square footage data ascertained based on actual usage.

48.    Moreover, the Headcount Report was inherently flawed for several reasons:

    a.    it included only permanent employees and seasonal workers, and excluded temporary employees (whether full or part-time), contract employees, employees of other entities, such as LEE and TFALL, and non-compensated workers (e.g., Interns, Fellows, Volunteers, etc.);

    b.    it only assigned employees to one department and one location despite the fact that many employees reported to multiple locations and had dedicated space other than where they were assigned, or had secondary work assignments (i.e., titles, duties, etc.) outside of, or in addition to their primary assignment;

    c.    it failed to account for employees who were coded as "Home" but also had dedicated space in Teach For America's offices.  The failure to properly account for space used by these employees was particularly egregious because these employees were frequently administrative employees who would not be directly allocable to the Federal Grants.

49.    Further, the Headcount Report was not always accurate or updated in a timely fashion, and did not distinguish employees in some locations by floor or specific area despite the fact that the leases may be contracted on that basis.

50.    Most importantly, Teach For America used the Headcount Report to allocate lease expenses despite the fact that no regulation or generally accepted accounting principle recommends the use of an employee headcount as a suitable methodology for the allocation of general occupancy-related expenditures.

{00069265 1 }                                    12

51.    In a meeting in November 2013, Relator discussed Teach For America's improper allocation of rental expenses with, among others, Miguel Rossy and Nancy Kong.  Relator advised Rossy and Kong that square footage information was available and could be used to allocate rent expenses for the Federal Grants.  Notwithstanding this meeting, Teach For America submitted its trial balances with respect to the i3 Grant to the Government without correcting its allocation of rental expenses.

52.    As a result, Teach For America charged the Federal Grants for rental expenses for, among other things, space not occupied by Teach For America employees, space occupied by TFALL or LEE employees, and unassigned space with no direct benefit to the Federal Grants.

b.    Employees' Salaries

53.    Finally, Teach For America failed to use an appropriate method to allocate employees' salary, wages and fringe benefits.

54.    Section B.8 of the Attachment to the Circular sets forth principles for allocating employee salary, wages, and fringe benefits to federal grants and agreements.  The Circular prescribes that "[t]he distribution of salaries and wages to awards must be supported by personnel activity reports. . . except when a substitute system has been approved in writing by the cognizant agency."  Attachment § B.8.m(l); 2 C.F.R. Part 230, Appendix B § B.8.m(l).

55.    The Circular requires that reports reflecting the distribution of activity of each employee must be maintained for all staff members whose compensation is charged, in whole or in part, directly to awards.  Attachment § B.8.m(2); 2 C.F.R. Part 230, Appendix B § B.8.m(2).

56.    The Circular further requires that reports must be signed by the individual employee, or by a responsible supervisory official with first-hand knowledge, and that "the distribution of activity represents a reasonable estimate of the actual work performed by the

employee during the periods covered by the reports." Attachment § B.8.m(2)(c); 2 C.F.R. Part 230, Appendix B § B.8.m(2)(c).

57.   In furtherance of this requirement, Teach For America produced effort reports for its employees purportedly detailing the employee's distribution of work across any applicable federal grant.

58.   The effort reports purported to state, among other things, the percentage of each employee's salary that was charged to a particular grant or account.  The percentage of an employee's time spent on a particular grant is the same as the portion of his salary that is charged to a particular grant or account.

59.   In reality, the timesheets maintained by Teach For America reflected only the time an employee came to work, without any indication of what percentage of an employee's time was spent on any particular grant.  Instead, administrative staff arbitrarily created the effort reports without any communication or contact with employees or direct knowledge of the employees' duties.  Thereafter, Teach For America employees simply signed the reports prepared by the administrative staff.

60.   Moreover, Teach For America removed from the allocation any employee without timesheets, and substituted a larger percentage of other employees with timesheets to make up the difference – at times charging 100% of individual employee's time – a method prohibited by federal rules.  Attachment § B.8.m; 2 C.F.R. Part 230, Appendix B § B.8.m.

61.   After a post-award review conducted by the U.S. Department of Education in January and February of 2013, the Department of Education noted several deficiencies with the approval of employees' time sheets and a poor understanding on the part of Teach For America staff of their responsibility to verify the accuracy of prepopulated data contained in the effort

reports.

62. Notwithstanding this post-award review, no testing or time studies were done to verify the effort reports prepared by Teach For America.

63. As a result of Teach For America's lack of an effective effort reporting system, Federal Grants were often charged for personnel costs for employees who did not actually perform work on the grant, or were in positions ineligible for reimbursement, such as administrative staff, LEE or TFALL employees, and alumni workers.

## FIRST CAUSE OF ACTION

### Violations of the False Claims Act: Presenting False Claims for Payment
### (31 U.S.C. § 3729(a)(1)(A))

64. Plaintiffs repeat and reallege paragraphs 1 through 62 as if fully set forth herein.

65. As a result of its inadequate accounting system, its failure to properly allocate credits and expenses, and its failure to have a suitable means of verifying that credits and expenses were properly allocated to the Federal Grants, Defendant presented false or fraudulent claims for payment or approval in violation of 3l U.S.C. § 3729(a)(1)(A).

66. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

67. By reason of the false or fraudulent claims made and caused to be made by Defendant, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil monetary penalty of $5,500 to $11,000 for each false claim.

## SECOND CAUSE OF ACTION

### Violations of the False Claims Act: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B)

68.    Plaintiffs repeat and reallege paragraphs 1 through 66 as if fully set forth herein.

69.    As a result of its inadequate accounting system, its failure to properly allocate credits and expenses, and its failure to have a suitable means of verifying that credits and expenses were properly allocated to the Federal Grants, Defendant made or used, or caused to be made or used, false records or statements that were material to getting false or fraudulent claims paid or approved by the United States.

70.    By reason of these false records or statements, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be determined at trial, plus a civil monetary penalty of $5,500 to $11,000 for each false claim.

## THIRD CAUSE OF ACTION

### Violations of the False Claims Act: False Record or Statement to
### Avoid an Obligation to Refund Payments Received
### 31 U.S.C. § 3729(a)(1)(G)

71.    Plaintiff repeats and realleges ¶¶ 1 to 69 as if fully set forth herein.

72.    Defendant made and used or caused to be made or used false records or statements – i.e., trial balance reports – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

73.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

74.    By virtue of these false records or false statements, the United States has suffered damages and therefore is entitled to treble damages under the FCA, in an amount to be

{00069265 1 }                                      16

determined at trial, plus a civil monetary penalty of $5,500 to $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States, demands and prays that judgment be entered in its favor against Defendant as follows:

1.      On the Counts under the False Claims Act treble the amount of damages sustained by the United States and civil penalties for each false claim or false statement, as provided by law; and

2.      A relator's award of up to 30% of the amounts recovered by or on behalf of the United States, as provided by law;

3.      For all Causes of Action alleged herein by Relator, all expenses and attorneys' fees related to this legal action, as provided by law; and

4.      Any other equitable relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Craig W. Love hereby demands a trial by jury.

Dated:      White Plains, New York
            March 21, 2017

                              **YANKWITT LLP**

                    By:    _____
                           Kathy S. Marks
                           140 Grand Street, Suite 501
                           White Plains, New York 10601
                           Tel: (914) 686-1500

{00069265 1 }                        17